Morrow Trust, Frank A. Morrow, Trustee v. Commissioner.
Morrow Trust v. Commissioner
Docket No. 29599.
United States Tax Court
1951 Tax Ct. Memo LEXIS 89; 10 T.C.M. (CCH) 945; T.C.M. (RIA) 51289; September 28, 1951
*89 Watson Washburn, Esq., First Nat'l Bank Bldg., Miami, Fla., and W. H. Mactye, Esq., for the petitioner. John J. Madden, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the petitioner's income, declared value excess-profits, and excess profits taxes for the years 1942 through 1945 as follows: Declared
Value Excess-
Excess
Income Tax
Profits Tax
Profits Tax
1942
$6,733.90
$11,755.86
$ 47,123.30
1943
6,733.90
25,703.04
128,479.69
1944
9,370.56
31,023.72
138,449.72
1945
9,370.56
23,719.80
103,868.99
The only issue requiring decision is whether the petitioner was an association taxable as a corporation. Other alternative issues have been raised but need not be discussed. Findings of Fact Rose C. Belden died testate in September 1937 naming her children, Howard B. Morrow, Frank A. Morrow, Robert R. Morrow, William C. Morrow, Hazel Flanagan, and Rose Ryner, as equal beneficiaries of her residuary estate. She was engaged at the time of her death in operating ten retail nut stores located in various parts of the country, each store bearing the *90 name "Morrow's Nut House." Those stores constituted her residuary estate. All of her children, except Rose Ryner, had been engaged in operating their own nut stores for several years prior to 1937, and Howard, Frank, and Robert had been operating several additional stores as a partnership. Each of the stores operated by the children likewise bore the name "Morrow's Nut House." The business formerly operated by Rose Belden was in poor financial condition when taken over by Howard as executor of her estate. Her four sons and her daughter, Hazel, advanced approximately $10,000 to the estate at that time in order to carry on the business. Hazel, representing herself and her four brothers, purchased from Howard, as executor, the assets constituting the residuary estate of Rose Belden on October 25, 1937, for $5,000. The assets were sold to Hazel as a means of disposing of the interest therein held by Rose Ryner, a beneficiary of their mother's estate. Hazel, on December 20, 1937, transferred to each of her four brothers a one-fifth interest in the property which she had acquired from her mother's estate on October 25, 1937. A written partnership agreement was entered into between *91 those five persons dated December 20, 1937. An instrument entitled "Trust Agreement" was executed on May 24, 1938, by Hazel as donor and Frank as trustee and provided in part as follows: "That in consideration of the acceptance of the trust hereby created * * *, the Donor has assigned, transferred and delivered * * * to the Trustee, all the property, leases and all other rights, title and interest in real property and all personal property, tangible and intangible of whatsoever kind and nature and wheresoever situate formerly comprising the estate of ROSE BELDEN, Deceased, * * * which said property was heretofore assigned, set over and transferred to the Donor by all of the persons named as distributees in the Last Will and Testament of said ROSE BELDEN, Deceased, by an instrument in writing dated the day of , 193, and the Trustee agreed to hold, manage, invest, reinvest and distribute the same as a Trust Fund under the following terms and conditions." The instrument provided that the trustee should have exclusive and wide power to manage and extend the business operated under the trust. He was to distribute the net income equally among the five beneficiaries as he saw fit and *92 was to distribute the trust estate to them on termination of the trust. The donor retained the power to terminate or change the trust after ten years. The ten nut stores which belonged to Rose Belden at the time she died were not transferred to Hazel by the persons named as distributees in Rose Belden's will and Hazel did not have legal title to those stores on May 24, 1938, but at that time they were the property of a partnership in which she had a one-fifth interest. The stores formerly owned by Rose Belden were operated by the four brothers and Hazel as a partnership beginning December 20, 1937. The purposes which they gave for the agreement of May 24, 1938, were to differentiate the partnership operating the ten stores obtained from their mother's estate from their other existing partnerships, and to have one partner represent the partnership. They believed that the agreement of May 24, 1938, created another form of partnership. There was no change in the operation of the business on or after May 24, 1938. The five parties consulted one another frequently in reference to the conduct of the business, and no important question was decided except after discussion by all the parties. *93 They regarded themselves as partners and considered the business that of a partnership. All of the stores were operated under the name "Morrow's Nut House." Operating funds were obtained in that name under the signatures of Howard, Frank, and Robert. The business advertised, received bills, and entered into contracts in that name. Each of the five individuals contributed services to the business. Howard acted as general manager for two or three years beginning at his mother's death. Robert then took over as general manager until late in 1945. The five individuals agreed among themselves as to which one should act as general manager. All five made loans to the business and purchased supplies for the business. The business was never represented to the public as a limited liability trust. Nuts were frequently purchased in bulk by one of the five and then drawn on by the various stores regardless of who owned them. The store which actually received the nuts was billed by the seller and made payment. Creditors were informed in some instances that all five individuals were liable for the debts incurred. Frank, Howard, and Robert executed an instrument in 1938 purporting to convey their *94 interests in the business to themselves as trustees for the benefit of the employees of the business. This trust was terminated a few years later. Robert executed an instrument dated June 2, 1942, purporting to convey his interest in the trust to his daughter, Virginia Sheffield. William executed an instrument in 1942 purporting to transfer his interest in the trust to a trustee for the benefit of his children. Frank executed an instrument dated March 15, 1943, purporting to convey his interest in the trust to his wife, Marcella. Howard, by an instrument dated July 1, 1943, purported to transfer his interest in the trust to his wife, Phyllis. No certificates of interest were ever issued by the partnership or by the trustee. All of the individuals consulted the other four and obtained their consent before executing the instruments mentioned in the preceding paragraph. Notations were made on the books of the petitioner to the effect that a new partner had been admitted as of the date of each purported transfer. Finduciary income tax returns for the years 1938 through 1942 were filed in the name of "Morrow Trust"by Frank A. Morrow, Trustee. They showed all of the income from the *95 business distributable to the beneficiaries of the trust and no tax due. The distributees for the years 1938 through 1941 were the Morrow Employees' Trust, William C. Morrow, and Hazel Flanagan. The distributees shown for 1942 were Howard, Frank, and Hazel, each receiving a full one-fifth, Robert for a part of a share and Virginia Sheffield for the balance, William for a part of a share and the trustee for his children for the balance. A fiduciary return for 1943 in the name of "Morrow Trust" was signed by Robert as trustee. It showed the income of the business distributable one-fifth to Hazel and the remainder to those named in the purported transfers. A fiduciary return for 1944 in the name of "Morrow Trust" was filed by Frank as trustee. It showed total income of $226,458.68, of which $182,500 was distributable one-fifth to Hazel and the other four-fifths to those named in the purported transfers. The return showed net taxable income of $43,958.68 and tax due of $23,718.25. Frank filed an amended return for 1944 on a partnership form 1065. It reported net income of $226,458.68 and showed the distributive shares thereof as belonging one-fifth to Hazel and the other four-fifths *96 to those named in the purported transfers. The Commissioner mailed the notice of deficiency covering all of the taxable years to "Morrow Trust, Frank A. Morrow, Trustee." He gave as an explanation of his determination of the deficiency the following: "It is held and determined that the Morrow Trust, being the Rose Belden branch of Morrow Nut Houses, constitutes an association within the purview of section 3797 (a) (3) of the Internal Revenue Code." The business which gave rise to the income here in question during the taxable years was not operated as an association which resembled a corporation within the meaning of section 3797 (a) (3) of the Internal Revenue Code, and Morrow Trust did not resemble a corporation and was not an association taxable as a corporation within the meaning of section 3797 (a) (3) of the Internal Revenue Code. Opinion MURDOCK, Judge: Section 3797 (a) (3) defines corporations to include associations. The Commissioner in his Regulations 111, section 29.3797-2, defines an association as any organization created for the transaction of designated affairs, or the attainment of some *97 object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group acting in a representative capacity. The Morrows carried on the business here in question in a most informal manner and without much regard for legal forms. They originally created a partnership with the five of them as equal partners. Then Hazel and Frank executed a trust instrument, but the evidence shows that Hazel at that time did not have title to the property which she purported to convey to the trust, so for that reason, if for no other, the trust never owned the business and the trustee was never in position to carry on the business as a trustee. Furthermore, the evidence shows that the trustee did not carry on the business as a trustee at any time. Howard was designated to act as general manager and was succeeded by Robert. Frank, who was named as trustee, never acted as general manager. The other individuals took an active part in the operation of the business and did many things just as partners would do. They assumed liabilities which would *98 not have been theirs under a fiduciary operation and they assumed authority which they did not have under the trust. The trust, even if it were to be regarded as the actual earner of the income, bore little or no resemblance to a corporation. There was no centralized control, no limitation of personal liability to the property embarked in the enterprise, the title to the property was not in the name of the trust, and there were no facilities for the transfer of interests. The question of whether the instruments, purporting to transfer interests in the trust, actually transferred any interests in the business, which did not belong to the trust, need not be decided. Business affairs were not conducted by a single individual, a committee, a board, or some other group acting in a representative capacity. Thus, under no theory can the determination of the Commissioner be sustained on this record. Decision will be entered for the petitioner.